IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| KRISTINE CORZINE, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 5:12-CV-405 (CAR)** |
| | : | |
| LITTLE LEAGUE BASEBALL | : | |
| INCORPORATED, | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action arises from Defendant Little League Baseball Incorporated's termination of Plaintiff Kristine Corzine's employment on July 6, 2011.  Plaintiff contends Defendant terminated her because of her breast cancer in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*  Plaintiff also asserts a claim for intentional infliction of emotional distress.  Currently before the Court is Defendant's Motion for Summary Judgment on both claims.   Having considered the parties' arguments, the record, and applicable law, Defendant's Motion for Summary Judgment [Doc. 18] is **GRANTED**.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue

as to any material fact and the movant is entitled to a judgment as a matter of law."[1]  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[2]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[4]  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving

---

[1] Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[3] *See id.* at 249-52.

[4] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[5] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

party is not entitled to a judgment as a matter of law.[6]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

For purposes of this Motion, the material facts in the light most favorable to Plaintiff, the non-movant, are as follows:

### *Plaintiff's Employment*

On November 24, 2010, Defendant's Human Resources Director, Carol Kester, offered Plaintiff a position as receptionist/supply clerk for Defendant's Warner Robins, Georgia office.[8]  This position involved answering telephones, typing correspondence, filing various documents, selling merchandise, shipping and receiving merchandise, and overseeing the gift shop.[9]  It also included "assisting the Administrative Assistant," Sandy Popejoy.[10]  Plaintiff reported for work on December 6, 2010.[11]

During the first month of her employment, Plaintiff's direct supervisor, Regional Director Jennifer Colvin, praised Plaintiff's organization of the gift shop storage room and told Plaintiff she was doing "fine."[12]  Peter Frikker, the Assistant Regional Director, with whom Plaintiff worked most closely, told Plaintiff on a number of occasions that she

---

[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324-26.

[7] *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[8] Pl. Dep., p. 21-23 [Doc. 22]; Kester Dep., pp. 4-5 [Doc. 25]; Ex. D-3 [Doc. 23].

[9] Pl. Dep., p. 23; Pl. Aff., ¶ 11 [Doc. 31-1].

[10] Colvin Dep., p. 23; Ex. P-32 [Doc. 28].

[11] Pl. Dep., p. 23; Ex. D-5 [Doc. 23].

[12] *Id.* at 140; Pl. Aff., ¶ 3.

was "doing a great job."[13]   Various volunteers who worked with Defendant also complimented Plaintiff and commended her work.[14]   Kevin Parker, a facilities manager for Defendant's baseball stadium, also believed Plaintiff "was a good employee and was well liked by the entire staff."[15]

However, Sandy Popejoy, Plaintiff's friend and the Administrative Assistant who was "overseeing" her work, noted that Plaintiff had difficulty performing her job during periods of increased office workload in the spring and summer months.[16]   In addition, Colvin noted that Plaintiff failed to place documents in the appropriate files, even when the cover letter stated that a copy was to be kept in Defendant's files.[17]   A number of times during her employment, Plaintiff failed to follow office procedure and left telephone messages on sticky notes instead of the designated phone pad.[18]   In addition, Colvin noted that Plaintiff did not follow procedure in receiving materials and merchandise; she failed to verify the content and amount of shipments before signing that she had done so.[19]

On one particular occasion, Plaintiff changed a deadline date on a letter sent to the

---

[13] Pl. Aff., ¶ 9.

[14] Pl. Dep., p. 141-42.

[15] Parker Aff., ¶¶ 3, 5 [Doc. 31-2].

[16] Popejoy Dep., pp. 8-11 [Doc. 26].

[17] Colvin Dep., p. 37; *see* Pl. Dep., p. 91.

[18] Colvin Dep., p. 40.

[19] *Id.* at 40-41.

district administrator and other high-level officials without Colvin's approval.[20]  Plaintiff later approached Colvin and apologized for her error.[21]  When Colvin asked "what had possessed [her] to change the date," Plaintiff explained that she thought she had entered the correct date.[22]  Colvin appeared to accept Plaintiff's explanation.[23]

Colvin never formally counseled Plaintiff about these incidents; however, Colvin claims she spoke with Plaintiff about them.[24]  Colvin never documented these conversations even though it is standard practice to do so.[25]  According to Plaintiff, Colvin did not criticize or counsel her about these incidents.[26]  In fact, Plaintiff only received negative feedback on two occasions during the course of her employment.[27]  On December 17, 2010, Kester sent Plaintiff's direct supervisor, Regional Director Jennifer Colvin, an email stating that "[w]e need to talk about Kristine Corzine.  I see red flags already."[28]  According to Kester, Plaintiff was taking a lot of personal time off to check her son into rehab early in her employment.[29]  Although Kester was "somewhat

---

[20] Pl. Dep., pp. 155-56; Colvin Dep., p. 38.

[21] Pl. Aff., ¶ 6.

[22] Pl. Dep., p. 155-56; Pl. Aff., ¶ 6.

[23] Pl. Aff., ¶ 6.

[24] Colvin Dep., p. 42.

[25] *Id.* at 43; Kester Dep., p. 29.

[26] Pl. Aff., ¶ 4.  Plaintiff does not dispute that these incidents occurred; she merely contends that Defendants did not critique her behavior or document these issues.

[27] Pl. Dep., p. 138.

[28] *Id.* at pp. 23, 91; Colvin Dep., pp. 8, 46 [Ex. 27]; Ex. P-8 [Doc. 28].

[29] Colvin Dep., p. 47.

sympathetic" to Plaintiff's position, she instructed Colvin to monitor the situation.[30] Kester subsequently spoke to Plaintiff about time-off accrual, and, in a separate conversation with Colvin, Plaintiff explained that she had misunderstood Defendant's time accrual policy.[31]  Later, on April 14, 2011, Kester reminded Plaintiff to personally call a business line during office hours when calling in sick.[32]  Plaintiff's husband had called another employee's private cell on her behalf.[33]  Neither of these incidents constituted a violation of the employee handbook policies.[34]

*Employment Evaluations*

Defendant generally conducts a performance appraisal at the end of a new employee's first six months or at the end of her first year.[35]  Defendant's employee handbook notes that the appraisal "is intended to provide the employee with feedback on his/her performance over the specified period of time from the immediate supervisor. … The appraisal is also intended to provide information that may assist the employee in improving his/her future performance[.]"[36]  However, an immediate supervisor "need not wait for performance appraisal to take corrective action"; instead, she may choose to

---

[30] *Id.* at  47.

[31] *Id.* at 47-48.

[32] Ex. D-23 [Doc. 23].

[33] Colvin Dep., p. 48-49.

[34] *Id.* at 44.

[35] Kester Dep., pp. 15-17; Colvin Dep., p. 28.

[36] Ex. P-6, p. 50 [Doc. 28].

discuss an employee's deficiencies at any time.[37]

Plaintiff's six-month anniversary was June 6, 2011.[38]  Accordingly, on June 21, 2011, Kester sent Colvin an email inquiring about the status of Plaintiff's six-month performance appraisal.[39]  Therein, Kester stated, "I know we have issues with her, so I'm anxious to hear what you think.  We need to be constructive if we are going to help her improve so we can keep her on.  If she is not a good fit for our company, we need to know that also, so I can cut her loose."[40]  Colvin did not respond to Kester's email.[41] Kester sent Colvin a reminder email on June 30, 2011, asking her to forward Plaintiff's six-month appraisal because Defendant needed to "make a decision on her employment."[42]  In a responsive email, Colvin reported that she just needed "to add [her] notes to the actually [sic] form...."[43]   Kester then asked whether Colvin had a recommendation and if Colvin wanted Plaintiff to continue.[44]  The same day, Colvin told Kester by telephone that it would be best for the Warner Robins office if Plaintiff was not retained.[45]   Kester related Colvin's termination recommendation to the ultimate decisionmaker, Dave Houseknecht, Defendant's Senior Vice President of Administration

---

[37] *Id.*

[38] *See* Ex. P-1 [Doc. 28].

[39] Colvin Dep., pp. 52-53; Kester Dep., p. 31; Ex. P-12 [Doc. 28].

[40] Ex. P-12.

[41] Kester Dep., pp. 33-34.

[42] Colvin Dep., pp. 55-56, 57; Kester Dep. 33; Ex. P-12.

[43] Ex. P-13 [Doc. 28].

[44] *Id.*

[45] Colvin Dep., p. 58.

and Chief Financial Officer.[46]

Colvin finally faxed a copy of her appraisal to Defendant's headquarters at 7:42 a.m. on July 5, 2011.[47]  Therein, Colvin gave Plaintiff two "G" or "Good" ratings for her independence and creativity, two "U" or "Unsatisfactory" ratings for adaptability and judgment, and six "I" or "Needs improvement" ratings in accuracy, productivity, competency, communication, teamwork, and organizational skills.[48]  Colvin specifically noted that Plaintiff was "very neat" but "need[ed] to work on accuracy & completeness," had "difficulty w/ multi-tasking," was "emotional when given feedback," needed to "improve retention on tasks shown/explained," "listens but does not 'hear' or comprehend," "judgment on who & when to interrupt,"  "changes content of letters," was deficient regarding "notification of phone calls" and "prioritizing tasks," was "distracted with ongoing, personal issues," "timid and emotional with any type of feedback," and produced "neat and organized" work but "need[ed] to know when/how to use tools."[49]   In completing her evaluation, Colvin was "contemplating constructive criticism in an effort to have [Plaintiff] improve as an employee."[50]  Colvin's appraisal did

---

[46] Houseknecht Dep., pp. 17-18 [Doc. 24].

[47] Ex. P-15 [Doc. 28].  Colvin contends that she sent an earlier copy of her appraisal to headquarters on June 30 or July 1, but Plaintiff objects to this assertion because Defendant has not produced a fax or other evidence to support Colvin's testimony.  Pl. Response, p. 12 [Doc. 31].  This is not a material fact.  The Court assumes, without deciding, that Colvin did not send the appraisal until July 5.

[48] Ex. P-15.

[49] *Id.*

[50] Colvin Dep., p. 73.

not explicitly recommend Plaintiff's termination.[51]   Kester reviewed Colvin's appraisal

when she returned to work the next day, July 6th, and made the following notes about

Plaintiff: "Not a good fit," "Not good w/ multi-tasking & adaptation to change," "Unable

to perform duties in a satisfactory manner," "End today July 6."[52]

On July 6, 2011 Houseknecht decided to terminate Plaintiff based on Colvin's oral

recommendation and his review of Colvin's appraisal.[53]    Houseknecht had no

knowledge of Plaintiff's medical appointments or request for time off at the time he

made his decision.[54]

### Plaintiff's Disability and Termination Proceedings

Plaintiff discovered a lump in her breast on July 4, 2011, two days before she was

terminated.[55]   Plaintiff discussed her discovery with Popejoy on July 5, 2011, after

Plaintiff arrived at work around 9:00 a.m.[56]   Popejoy then told Colvin that Plaintiff

needed time off for a doctor's appointment.[57]   In her deposition, Plaintiff admitted that

she does not specifically remember talking to Colvin about the lump in her breast that

---

[51] *See* Exs. P-15, P-16 [Doc. 28].

[52] Ex. P-22 [Doc 28]; Kester Dep., p. 60.

[53] *See* Kester Dep., pp. 40-41, 55; Houseknecht Dep., pp. 28-29.   Houseknecht contends that he made a termination decision prior to July 6th based on Colvin's aforementioned June 30/July 1 appraisal; however, based on the Court's previous assumption, for purposes of this Motion, Houseknecht did not review this document until July 6th.

[54] Houseknecht Dep., pp. 15, 22.   Pursuant to Local Rule 56, "[a]ll material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56.

[55] Pl. Dep., pp. 52, 71.

[56] *Id.*; Popejoy Dep., p. 18.

[57] Popejoy Dep., pp. 18-19.

day, but she is fairly certain that she reported some specific details to justify her request for time off during baseball tournament season, the busiest time of the year for Defendant.[58]

Plaintiff visited Dr. Sekhar, an OB-GYN, around 5:30 p.m. that day.[59]  Dr. Sekhar asked Plaintiff about her condition and performed a physical examination.[60]  He also provided Plaintiff with a note stating that she was seen in his office on July 5, 2011.[61]

The next day, July 6, 2011, Plaintiff arrived at work around 9:00 a.m. and spoke with Popejoy about her doctor's visit.[62]  Plaintiff told Popejoy that Dr. Sekhar believed the lump was a mass—not merely a cyst—and he recommended a mammogram and ultrasound as soon as possible.[63]  Popejoy offered to speak to Colvin on Plaintiff's behalf to explain the importance and nature of Plaintiff's prior appointment and why she needed additional time off for a second appointment.[64]  Plaintiff provided Popejoy with a copy of Dr. Sekhar's note along with his separate order for a mammogram.[65]  Popejoy carried both the note and order into Colvin's office.[66]

Over the next few hours, Colvin received an "unusual" number of calls from

---

[58] Pl. Dep, pp. 54, 56-57, 67; *see* Colvin Dep., pp. 13, 85.

[59] Pl. Dep., p. 58.

[60] *Id.* at pp. 59-60.

[61] *Id.* at p. 60; Ex. D-26 [Doc. 23].

[62] Pl. Dep., p. 64.

[63] *Id.*

[64] *Id.* at 65.

[65] *Id.* at 66.

[66] *Id.*

headquarters.[67]  Colvin shut her office door each time she accepted a call, leading Plaintiff to think that "[s]omebody must be in big trouble."[68]  At 12:11 p.m., Kester sent Colvin an email requesting feedback on a rough draft of Plaintiff's termination notice and noting that Kester needed to locate Houseknecht for a telephone call.[69]

Later that afternoon, Colvin met with Plaintiff in a private conference room.[70] Only Plaintiff and Colvin were physically present in the conference room; Kester participated by speaker phone from Defendant's headquarters in Pennsylvania.[71]  Kester informed Plaintiff that her employment with Defendant was being terminated, effective immediately, because she could not perform the job satisfactorily, could not multitask, did not get along with coworkers, became distracted by personal issues outside of the office, and Plaintiff was not a good fit for the Warner Robins office.[72]  After the call ended, Kevin Parker helped Plaintiff take her personal items to her car.[73]

Plaintiff received official confirmation of her breast cancer on July 19, 2011.[74]

## DISCUSSION

### I.      Disability Discrimination Claim

The  Americans  with  Disabilities  Act  ("ADA")  prohibits  employers  from

---

[67] Pl. Aff., ¶ 17.

[68] *Id.*

[69] Ex. P-20 [Doc. 28].

[70] Pl. Dep., p. 71.

[71] *Id.* at 71-72.

[72] *Id.* at 73-74.

[73] *Id.* at 78, 92-93; Colvin Dep., pp. 112-13.

[74] Pl. Dep., p. 111.

discharging qualified employees based on their disabilities.[75]  When a plaintiff seeks to prove an ADA violation through circumstantial evidence, as in this case, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*[76] guides the Court's analysis.[77]  Under this framework, a plaintiff must first establish a prima facie case by establishing "facts adequate to permit an inference of discrimination."[78]  If the plaintiff establishes her prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.[79]  If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[80]  Importantly, the ultimate burden of persuasion remains on the plaintiff all times.[81]

The Court notes that the *McDonnell Douglas* method "was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[82]  Ultimately, a plaintiff will overcome summary judgment if she creates a genuine issue of material fact that permits a "reasonable inference" the employer acted

---

[75] 42 U.S.C. § 12112(a).

[76] 411 U.S. 792 (1973).

[77] *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

[78] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[79] *Cleveland*, 369 F.3d at 1193.

[80] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[81] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[82] *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation omitted).

with discriminatory intent.[83]

1. *Prima Facie Case*

To establish a prima facie case for disability discrimination, a plaintiff must specifically demonstrate that (1) she has a disability; (2) she was a "qualified individual" for the position; and (3) she was subjected to unlawful discrimination because of her disability.[84]   For purposes of this Motion, Defendant concedes that Plaintiff has a disability and was qualified to perform her job.  However, Defendant asserts that she cannot establish the ultimate decisionmaker, Houseknecht, terminated Plaintiff's employment based on her disability because he did not know Plaintiff's medical condition when he made his decision.  Plaintiff does not dispute this fact; however, she claims that Houseknecht was a mere "cat's paw" for Colvin's own discriminatory animus.  The Court disagrees.[85]

Under a cat's paw theory of causation, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated the allegations of misconduct.[86]   "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus."[87]   Under a cat's paw

---

[83] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

[84] 42 U.S.C. § 12112(a); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-26 (11th Cir. 2005).

[85] The Court assumes *arguendo* that cat's paw analysis applies in the context of ADA claims.

[86] *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

[87] *Id.*

theory, a plaintiff must "prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee."[88]

Here, the undisputed facts show that Colvin verbally recommended Plaintiff's termination to Kester on June 30, 2011, four days before Plaintiff discovered the lump in her breast.[89]   Moreover, Colvin faxed her performance appraisal to Defendant's headquarters on July 5th at 7:42 a.m.—more than one hour before Plaintiff discussed her unfortunate discovery with Popejoy.[90]   Houseknecht decided to terminate Plaintiff on July 6, 2011, based on Colvin's verbal recommendation and her appraisal.[91]   He did not have knowledge of Plaintiff's medical appointments at the time he reached this decision.[92]   Even assuming, *arguendo*, that Colvin developed a discriminatory animus after learning of Plaintiff's medical condition, that animus had no bearing on Colvin's previously-submitted appraisal and recommendation which led to Plaintiff's termination.

Moreover, Plaintiff has not presented sufficient evidence for a reasonable jury to infer that Colvin had any further influence on Houseknecht's decision.  In her affidavit,

---

[88] *Id.* at 1331.

[89] Colvin Dep., p. 58; Pl. Dep., p. 52.

[90] Ex. P-15; Pl. Dep., p. 52; Popejoy Dep., p. 18.

[91] Houseknecht Dep., pp. 28-29.

[92] *Id.* at 19, 22.

Plaintiff recalls that Colvin received an "unusual" number of calls from the headquarters on the morning of July 6th after Popejoy spoke with Colvin on Plaintiff's behalf.[93]   Colvin shut her office door each time she accepted a call, leading Plaintiff to think that "[s]omebody must be in big trouble."[94]   Consequently, Plaintiff surmises that these "secret" phone calls are obvious evidence of Colvin's discriminatory conduct.[95]   She is mistaken.

It would be pure speculation to infer (1) that Colvin actually told someone about Plaintiff's condition; and (2) that information in some way or form reached Houseknecht or influenced his termination decision.[96]   In short, a jury could not draw the reasonable inference that Colvin caused Plaintiff to be terminated because of her disability.   Because Plaintiff has failed to raise a genuine question that Houseknecht's decision was influenced by Colvin's alleged discriminatory animus, Plaintiff has failed to establish her prima facie case.   Accordingly, her ADA claim must be dismissed.

## II.   Intentional Infliction of Emotional Distress Claim

To establish a prima facie case for intentional infliction of emotional distress, a plaintiff must prove (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) a causal connection existed

---

[93] Pl. Aff., ¶ 17.

[94] *Id.*

[95] *See* Pl. Response, p. 31 [Doc. 31].

[96] *See, e.g., Clover v. Total Sys. Servs. Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999).

between the wrongful conduct and the emotional distress; and (4) the emotional harm

was severe.[97]   "Whether a claim rises to the requisite level of outrageousness and

egregiousness to sustain a claim for intentional infliction of emotional distress is a

question of law."[98]   Liability only attaches "where the conduct has been so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and

to be regarded as atrocious, and utterly intolerable in a civilized community."[99]

Here, Plaintiff alleges that Defendant's actions were extreme and outrageous

because Defendant terminated her employment despite Plaintiff's vulnerable physical

and emotional state.   The Court disagrees.   First, Plaintiff has failed to create a genuine

issue of material fact that Defendant terminated Plaintiff because of her disability.

"Absent a [discriminatory] motive in violation of public policy, 'an employer in Georgia

may discharge an at-will employee for any reason or no reason.'"[100]   Second, Defendant

conducted Plaintiff's termination in a professional manner.    Plaintiff received her

termination notice in a private conference room, and Kester explained the reasons for her

dismissal.[101]   After the meeting ended, Kevin Parker helped Plaintiff take her personal

---

[97] *Everett v. Goodloe*, 268 Ga. App. 536, 545 (2004).

[98] *Phinazee v. Interstate Nationalease, Inc.*, 237 Ga. App. 39, 39 (1999) (internal quotation omitted).

[99] *Id*. at 40 (internal quotation omitted).

[100] *Pitts v. Wild Adventures, Inc.*, No. 7:06-CV-62-HL, 2008 WL 1899306, at *8 (M.D. Ga. Apr. 25, 2008) (quoting *Phinazee*, 237 Ga. App. at 41); *see also Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 462 (6th Cir. 1986) ("Where the actor does no more than insist upon his own legal rights, no liability [for intentional infliction of emotional distress] will be imposed.") (internal quotation omitted).

[101] Pl. Dep., pp. 71-74.

items to her car.[102]    Accordingly, Defendant is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 18] is **GRANTED**.

**SO ORDERED**, this 21st day of March, 2014.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

BBP/ssh

---

[102] *Id*. at 78, 92-93; Colvin Dep., pp. 112-13.

17